## EMERY *v.* BERRY, EXECUTOR, &c.

All acts which assume any control over the property of a deceased person, will, without legal right shown, make such person an executor in his own wrong as against creditors.

Acts of necessity or humanity, which do not evince any legal control over the property of the deceased, will not make a person an executor *de son tort.*

It *seems* that an executor *de son tort* may discharge himself from his liability as such, by taking out letters of administration.

Where money was received by the father, residing in this State, as the avails of the estate of his son, who died in California, and nothing was disclosed showing the purpose for which the money was sent, or that any one in California or elsewhere had any right to its legal control—*held,* that the possessor of the money here might be charged as executor *de son tort* by a creditor of the deceased.

A printed volume of the statutes of a sister State, purporting upon its face to have been printed by its authority, and to contain the laws of such State, is admissible as *prima facie* evidence to prove such statutes.

The statutes and written laws of a sister State cannot be proved by parol evidence.

A merely clerical error in the making up of the record of a court, by its clerk, may be corrected by the docket, by order of the court, without notice to the parties.

DEBT, on a judgment alleged to have been rendered in the district court for the western district in the State of Maine, held at Alfred, in and for the county of York, on the third Tuesday of October, 1849, in favor of the plaintiff against Joseph Berry, deceased, and one Brackett Merrill.

The defendant pleaded, first, *Nul tiel record;* and second, *Ne unques executor.* To the plea of *Nul tiel record,* the plaintiff replied that there is such record, and an issue was joined thereon to the court; and to the second plea he replied that the defendant, as executor in his own wrong of said Joseph, deceased, unlawfully intermeddled with the money of said Joseph, and belonging to his estate, and an issue was joined thereon to the country.

Upon the trial, the plaintiff, for the purpose of sustaining

the issue to the court, introduced as a witness, Asa Low, Esquire, who testified that he was a practising attorney and counsellor at law, in the county of York, was familiar with the courts of law in that county, and knew what the laws of the State of Maine were in reference to the organization of said courts; that by an act of the Legislature of that State, which took effect on the 1st day of May, 1852, the district courts of the State, which had existed for several years prior thereto, were abolished, and their powers and authority for the several counties, the business pending therein, and the records and files pertaining thereto, were transferred to and vested in the supreme judicial court for said counties, respectively; and that by the provisions of said act, the clerk of the supreme judicial court for the county of York had the custody of the records and files of the district court for that county.

To the admission of this evidence the defendant objected, but the court overruled the objection.

Mr. Low testified further that the Hon. Ether Shepley was, and for many years had been, the acting chief justice of the supreme judicial court of that State; that he was well acquainted with the hand-writing of Chief Justice Shepley, and that he had no doubt the signature, purporting to be his, to the certificate annexed to the copy of the judgment introduced by the plaintiff, and authenticating the same, was his genuine signature.

The plaintiff then introduced a copy of the judgment of the district court for the western district, with the certificate of Judge Shepley annexed hereto, of which the following is a copy:

" I, Ether Shepley, chief justice of the supreme judicial court of the State of Maine, hereby certify that James O. McIntire, whose signature is hereto annexed, is clerk of all the judicial courts for the county of York, in this State; and has the keeping of the files, records and proceedings of said courts

in said county, and is by law the proper person to make out and certify copies of all records and proceedings of the supreme judicial court and district court for the western district, held for said county of York, and that full faith and credit ought to be given to his acts and attestations done as clerk aforesaid, and that his attestation hereto is in due form of law. Given under my hand and the seal of said supreme judicial court, this 18th day of December, A. D. 1852.

(Signed)         ETHER SHEPLEY."

The copy of the judgment was attested by McIntire, as clerk of said supreme judicial court; and annexed thereto was a copy of the original writ in the action in which said judgment was rendered, also attested by McIntire, and in the writ and judgment the said Berry and Merrill, the defendants in that action, are set up as of Somersworth, in the county of Strafford; and it was admitted on the trial that, at the time of suing out of said writ and the rendition of judgment, they were residents and inhabitants of this State, and not of the State of Maine.

From a copy of the original writ, it appeared that there were two counts in the declaration, the first being upon a promissory note for $460, payable to S. Lord & Co., or order, and indorsed to the plaintiff, and the second being for goods, wares and merchandize, sold and delivered, for work and labor done and performed, for money had and received, for money lent and advanced, and for interest on divers sums due.

In the judgment it is recited and set forth that " the said action was entered at the May term, 1849, of said district court for said western district, at which term the defendants appeared and answered by their attorney, Asa Low, Esquire, from which term said action was continued to the October term of said court, and now the defendants, though called, do not appear, but make default for the large note only by agreement. It is, therefore, considered," &c.

By the return of the officer upon the writ, it appeared that certain personal property was attached, and that no service of the writ was made upon either of the defendants. No other evidence of any notice to the defendants to the pendency of the action, was contained in the copy of the judgment, or in any of the copies in the case annexed thereto, than is found in the foregoing recital of the judgment.

Mr. Low further testified that he appeared as attorney for Berry and Merrill, at the May term of said court, by the request of Merrill, for the purpose of obtaining a continuance of the action ; that at the October term both of the defendants attended court in person, and proposed to the plaintiff, Emery, to become defaulted in the action, if he would take judgment for the note declared on only, to which, at first, the plaintiff objected, claiming to recover, under the second count, for certain oak posts, sold and delivered to the defendant ; that after considerable negotiation between the parties, as the cause was about to be called for trial, the plaintiff consented to accept the proposition, and the default was entered accordingly ; that Berry and Merrill were both conferred with by the witness in reference to this arrangement ; that both agreed to the default, and that together they settled and paid the witness' account for his services in and about the action.

Annexed to the copy of the judgment were copies of a first and second execution, attested by McIntire, purporting to have been issued on said judgment; the first dated October 20, 1849, on which was return of satisfaction in part ; the second dated August 19, 1851, issued for the unsatisfied balance of the first, and no return appeared thereon. Also annexed to said copy of judgment was a paper purporting to be a copy of the note on which the judgment was founded, and another paper, purporting to be a copy of memoranda and minutes entered on the docket of the district court for October term under said action, Emery v. Berry and Merrill. All of the copies aforesaid were attested by

McIntire in the common mode; and in addition thereto a certificate of McIntire, under the seal of the supreme judicial court, was annexed to said copy of the judgment and other copies annexed thereto, of which the following is a copy :

> " State of Maine.
> Clerk's office of the supreme judicial court,
> Alfred, December 18th, 1852.

York, ss.

I, James O. McIntire, clerk of the judicial courts for the county of York, certify that in the suit William Emery, plaintiff v. Joseph Berry and Bracket Merrill, defendants, judgment was rendered for the plaintiff, in the district court for the western district, begun and holden at Alfred, in and for the county of York, on the third Tuesday of October, A. D. 1849; that paper marked A hereto annexed, is a true copy of the note upon which judgment was rendered in said suit; paper marked B is a true copy of the writ and return thereon in said suit; paper marked C is a true copy of minutes on the docket of October term, 1849, of the district court for the western district for said county of York in said suit. The red ink indicates the attorneys who appeared in said suit. Paper marked D is a true copy of the judgment in said suit, as amended by order of the court. Paper marked E is a true copy of the first execution on said judgment, with officer's return thereon, and paper marked F is a true copy of the second execution which is issued on said judgment, which executions are now on file in the records of said court, and no third execution has issued on said judgment.

(Signed)          J. O. McIntire, Clerk."

In said copy of minutes from the docket of October term, 1849, the name of said Low appears in red ink, as attorney for the defendants, and an entry as follows: " Default for large note by agreement."

The defendant then offered a copy of judgment, attested

by said McIntire, the date of his attestation being August 5, 1852, purporting to be a copy of said judgment, authenticated in like manner as in the case of the copy introduced by the plaintiff, and corresponding, in all particulars, with the copy introduced by the plaintiff, except that it is not recited therein that the defendants appeared and answered by their attorney, Asa Low, Esq.; and except also that the words "for the large note only by agreement" are not contained therein; and he contended that this was the judgment rendered in said suit, and that the judgment was void for want of jurisdiction of the persons of the defendants. The plaintiff then introduced a copy, attested by said McIntire, and authenticated in like manner by the certificate of said Shepley, of a petition, signed by said Emery, addressed to the honorable the justices of the supreme judicial court, to be holden at Alfred, in and for the county of York, on the third Tuesday of September, 1852, reciting the suing out of said writ, the entry of the action, the attachment of the property on the writ, the want of service on the defendants, and also setting forth that Low appeared and answered to said action as the attorney of the defendants, and praying that the record of the judgment might be amended, by inserting therein that the defendants appeared and answered at said May term, by their attorney, Asa Low, Esq.; and also a copy so attested and authenticated of the order of court upon the petition as follows: "Supreme judicial court, September term, 1852, Mr. Justice Wells presiding, ordered that the prayer of the foregoing petition be granted so far that the record be amended by stating the facts as they appear on the docket." No evidence appeared upon the copies, or any paper introduced, that any notice was given of the pendency of said petition. The plaintiff then proved by the testimony of said Low, that by the laws of the State of Maine, one judge of the supreme judicial court is authorized to hold terms of said court for the trial of all causes by the jury except criminal trials for capital offences, and that

the September term, 1852, of said court for the county of York, was held by Mr. Justice Wells, an acting judge of said court.

Upon this evidence the court ruled that the issue to the court was made out on the part of the plaintiff, and the cause proceeded to the trial of the issue to the jury.

Upon this issue the plaintiff introduced evidence tending to show that said Joseph Berry, deceased, left this part of the country in the fall of 1849, for California, intending to be absent about two years; that he died in California some time prior to June, 1851; and that the defendant received, by way of a draft drawn in his favor by a banking-house in San Francisco on a broker in Boston, about $390, for which the defendant gave his receipt, as follows:

" June, 1851. Rec'd of Washington G. Matthews, by the hand of James L. Hanson, $400, proceeds of the estate of Joseph Berry, late of San Francisco, California.
(Signed) JOSEPH BERRY."

It further appeared from the evidence introduced by the plaintiff, that said Matthews, being a resident in San Francisco on the 28th of April, 1851, forwarded the draft to the care of Hanson, residing in Boston, with directions to deliver it to the defendant; that it was so delivered, and the money paid thereon to the defendant, by the broker in Boston upon whom it was drawn; and that the defendant had admitted, in conversation, that his son, Joseph Berry, the deceased, was dead, and that he had received from his estate from California about $400.

No evidence was introduced to show whether or not there was any administration of the estate of Joseph, the deceased, in California, other than as aforesaid.

The court ruled that upon this evidence, the issue to the jury was not maintained on the part of the plaintiff, and a verdict was taken by consent for the defendant, upon which

judgment was to be rendered or the same to be set aside and a new trial granted, according to the opinion of this court.

*Jordan*, for the plaintiff.

We have but a single suggestion to make. We rely upon the provisions of our statute to charge this defendant as executor in his own wrong. Those provisions are that if any person in any way intermeddle with the estate of a deceased person, he is liable to the creditors of such deceased person. Rev. Stat. ch. 153, § 15.

We contend that, under this section, the defendant is liable, and that the verdict should be set aside.

*Christie & Kingman*, for the defendant.

The evidence offered by the plaintiff to sustain the issue to the jury falls entirely short of proving that the defendant is an executor *de son tort*. At the most it only shows that he has received the proceeds of the estate from the hands of a third person. And it does not appear that the person was the rightful administrator of the estate under the law of California. 3 Bac. Abr. 22.

We contend, first, that it is incumbent on the plaintiff to show that the defendant has taken and converted to his own use the goods or personal chattels belonging to the deceased, at the time of his death. Nothing short of this will answer his purpose. Not a case can be found where any other principle is acknowledged; not a definition of the term " executor *de son tort* " which does not assume it. There will otherwise be none of the *indicia* by which to distinguish the person making himself the representative of the deceased. In other words, he must do, without authority, what an administrator has a right to do with the effects of the deceased. *Morrill* v. *Morrill*, 1 Shepl. 415; Toller on Exrs. 37, § 2; *Read's Case*, 3 Coke 33; 3 Bacon's Abr. 20, 21; *Leach* v. *Pillsbury*, 15 N. H. Rep. 139; *Mountford* v. *Gibson*, 4 East

Emery *v.* Berry.

441 ; 1 Dane's Abr. 570, 571, where the case of *Padget* v. *Priest*, 2 Term 97, is explained on the ground that the defendant himself sold the goods of the deceased by his servant.

In the second place, we say that it is not enough to show that a third person has paid over to the defendant the proceeds arising from a sale of the effects of the deceased. The money thus paid over never belonged to the deceased. The purchaser of the goods never having acquired a title to either, (for they may be taken from him in an action of trover, 5 N. H. Rep. 341,) the money which he paid cannot, in any manner, be considered as belonging ever to the estate of the deceased. *Pickering* v. *Coleman*, 5 N. H. Rep. 150.

But if the court should be of opinion that this verdict cannot be sustained, then we desire the opinion of the court on the several questions raised in the case on the issue to the court.

First, the statutes of a foreign State cannot be proved by an attorney of that State, professing to be acquainted with them. It is necessary to produce a copy of the statutes, authenticated by the seal of the State. *State* v. *Carr*, 5 N. H. Rep. 367 ; 1 Greenl. on Ev. 536, 537, 538.

Second, the supreme judicial court in York county could not amend the record of a judgment of the district court on an *ex parte* application, without notice ; certainly not in such a way as to affect the rights of third persons. *Bank of Newburgh* v. *Seymour,* 14 Johns. 219.

EASTMAN, J. In examining the questions presented by this case, we shall pursue the order taken in the argument, and consider, first, the ruling of the court by which a verdict was taken for the defendant upon the issue to the jury.

It may be stated, in general terms, that at common law an executor *de son tort* is one, who, without any authority from the deceased or the court of probate, does such acts as belong to the office of an executor or administrator ; and it is said that all acts of acquisition, transferring or possess-

ing of the estate of the deceased, will make an executor *de son tort;* because these are the only *indicia* by which creditors know against whom to bring their actions. 2 Bac. Abr. 387, and authorities there cited.

Our statute provides that " if any person shall unlawfully intermeddle with, embezzle, alienate, waste or destroy any of the personal estate of a deceased person, he shall stand chargeable and be liable to the actions of the creditors and others aggrieved, as executor in his own wrong, to double the value of the estate so intermeddled with, embezzled, alienated, wasted or destroyed." Rev. Stat. ch. 158, § 15.

What precise acts shall be deemed an intermeddling so as to charge a person as executor in his own wrong, has never, so far as we are advised, been directly passed upon by the courts of this State. The question has incidentally arisen in two or three cases, but no definite decision has been made. *Pickering & a.* v. *Coleman,* 12 N. H. Rep. 148; *Leach* v. *Pillsbury,* 15 N. H. Rep. 137. In the latter of these cases, it was said that " it seems that the single act of receiving and paying out a sum of money belonging to the estate of an intestate, will make a person an executor *de son tort,* so far that he may be charged as such."

If a stranger gets possession of the goods of the deceased before probate of the will, he may be charged as executor in his own wrong. *Read's Case,* 5 Coke 33, b; Salk. 313, pl. 19; Dyer 166, b; Roll. Abr. 918. And Mr. Justice *Buller,* in *Edwards* v. *Harben,* 2 Term 597, says, " in short, every intermeddling after the death of the party makes the person so intermeddling an *executor de son tort.*" And the same learned justice, in *Padget* v. *Priest,* 2 Term 97, says, " it is clear, from all the cases, that the slightest circumstance of intermeddling will make an executor *de son tort.*"

The case of *Padget* v. *Priest,* and the authority of Dyer 166, b, are cited and approved by Williams, in his note 2 to *Osborne* v. *Rogers,* 1 Saund. 265.

Emery *v.* Berry.

A careful examination of the authorities will, we think, show that, as between a creditor of the deceased and a person who may intermeddle with his goods, very slight acts indeed will make him liable as executor as *de son tort*. Acts of necessity or humanity, such as locking up his goods, burying the corpse of the deceased, or feeding his cattle, and similar acts of charity, by which a person does not assume to have any control over the property more than others, will not constitute a person executor in his own wrong. 2 Bacon's Abr. 288; 2 Black. Com. 507; Dyer 166. But where one possesses himself of the goods of the deceased, for the purpose of taking care of them, the object of the possession must be made to appear, before he can be discharged from the responsibility arising from his possession. *Hubble* v. *Fogartie*, 3 Richardson 413.

The best rule that occurs to us, that can be laid down upon the subject is this; that all acts which assume any particular control over the property, without legal right shown, will make a person executor in his own wrong, as against creditors. Any act which evinces a legal control, by possession, direction or otherwise, will, unexplained, make him liable. And this position the authorities seem fully to sustain. 2 Bac. Abr. 387; 5 Coke 33, b; *Edwards* v. *Harben*, 2 Term 597; *Padget* v. *Priest*, 2 Term 97; *Campbell* v. *Tousey*, 7 Cowen 64; *White* v. *Mann*, 26 Maine Rep. 361; *Wilson* v. *Hudson*, 4 Harrington 168; *Hubble* v. *Fogartie*, 3 Richardson 413; 1 Saund. 265, note.

*Mountford* v. *Gibson*, 4 East 441, and the other cases cited by the defendant's counsel, will not, we think, when carefully examined, be found to conflict with these views.

The evidence, in this case, was competent to show the defendant executor in his own wrong, and liable under our statute. It tended to show that the defendant had in his posssession $400, money which he had received from the estate of his son, Joseph Berry, who was an alleged debtor of the plaintiff, and who died in California. He received it

through a draft on Boston, sent by a Mr. Matthews, from San Francisco. The object for which the money was sent is not stated. It was sent to the defendant, subject to no order of the deceased, or of any administrator or executor of his in California. Matthews would appear to have been acting as the friend of the deceased, and, without any administration upon the estate, to have taken upon himself to send the avails of the property of the deceased to his father, in this State.

The case finds Berry to be dead. It finds, in effect, that the $400 belongs to his estate, and that the same is money, in the hands of the defendant, in this State. It does not appear that any administrator, executor, creditor or heir in California has any right to the property, or to its control. Nor does it appear that it was sent to this State by authority of any will or the decree of any probate court. Neither is any thing disclosed in the case by which it appears that any one in this State or elsewhere has any right to any legal control over it. It is, then, simply personal property of the deceased, in this State, in the hands of the defendant, subject to the rights or interference of no one, except as the statute shall point out. Being within our jurisdiction, under such circumstances, it may properly be administered upon in this State, for the benefit of the heirs and creditors residing here.

There has been no administration upon the estate of the deceased in this State, and the defendant is the only person shown to have intermeddled with the property here. He is the only one who has had it in his possession, and exercised control over it, and we infer from the facts stated, has declined to surrender the property or take out letters of administration upon the estate.

If the defendant desires to avoid the penalty prescribed by the statute, it seems that it may be done by his now taking out letters of administration. *Shillebar* v. *Wyman*, 15 Mass. Rep. 322.

We are the better satisfied with the conclusion to which we have arrived, as to the liability of this defendant, from comparing the section of the statute already cited with the twelfth section of the same chapter. The latter provides that " no person shall intermeddle with the estate of any person deceased, or act as the executor or administrator thereof, or be considered as having that trust, until he shall have given bond to the judge, with sufficient sureties, in such reasonable sum as he shall approve, upon condition," &c. While this section provides that no person shall intermeddle with the estate of any person deceased without giving bond, the fifteenth provides that if any person shall unlawfully intermeddle with the personal estate of any deceased person, he shall stand chargeable as executor in his own wrong. The two sections taken together would seem to show that when the legislature speak of an unlawful intermeddling, they mean all such as takes place without giving bond as administrator or executor.

Having arrived at the result to which we have, we might omit giving any opinion upon the competency of the plaintiff's evidence to sustain the issue to the court. But as the case will probably be tried again, we think it but proper that some intimation should be given as to the other questions presented, as desired by the defendant's counsel; especially as we are of opinion that a portion of the plaintiff's evidence is clearly defective.

The testimony of Mr. Low to prove the change in the organization of the courts of the State of Maine was inadmissible. The written or statute laws of a foreign government must be verified in the same manner as foreign judgments; by the exemplification of a copy under the great seal of State, or by a sworn copy. Unwritten laws may be shown by parol evidence. *Watson* v. *Walker*, 3 Foster's Rep. 471; *Church* v. *Hubbart*, 2 Cranch, 237; *Raynham* v. *Canton*, 3 Pick. 293; *Packard* v. *Hill*, 2 Wend. 411; *Lincoln* v. *Battelle*, 6 Wend. 475; 1 Greenl. on Ev. § 488.

How far the several United States shall be governed by these principles, when applied to themselves, is not fully agreed. Upon strict rules of evidence, the laws of one State can be proved in the courts of another only as foreign laws; each State being sovereign and independent in all things not surrendered to the general government by the constitution. The relations of the several States to each other are those of foreign States in close friendship, and they are liable to be treated by each other, except so far as governed by the constitution of the United States, as foreign independencies. 1 Greenl. on Ev. §§ 489, 504 ; *Mills* v. *Duryea,* 7 Cranch 481 ; *Hampton* v. *McConnell,* 3 Wheat. 234.

It seems that the rule in New York and Connecticut, and some other States, requires the statutes of sister States to be proved in the same manner as foreign laws. *Packard* v. *Hill,* 2 Wend. 411 ; *Brackett* v. *Norton,* 4 Conn. Rep. 517, 521 ; *Hemstead* v. *Reed,* 6 Conn. Rep. 480 ; *State* v. *Twitty,* 2 Hawks (N. C.) Rep. 441 ; *Bailey* v. *McDonnell,* 2 Harrington's (Del.) Rep. 34 ; *Van Buskirk* v. *Muloch,* 3 Harrison's (N. J.) Rep. 184.

But it has been otherwise held in the supreme court of the United States, and in the courts of several of the respective States. With them it has been decided that a printed volume, purporting on the face of it to contain the laws of a sister State, is admissible as *prima facie* evidence to prove the statute laws of that State. *Young* v. *Bank of Alexandria,* 4 Cranch, 384 ; *Thompson* v. *Musser,* 1 Dall. 458 ; *Thomas* v. *Davis,* 7 B. Munroe's (Ken.) Rep. 227 ; *Raynham* v. *Canton,* 3 Pick. 293 ; *Comparet* v. *Jernegan,* 5 Blackford's (Ind.) Rep. 375 ; *Biddis* v. *James,* 6 Binney, 321 ; *Kean* v. *Rice,* 12 Serg. & Rawle, 203 ; *Hanrick* v. *Andrews,* 9 Porter's (Ala.) Rep. 9 ; *Mullen* v. *Morris,* 2 Barr's (Penn.) Rep. 85 ; *Clark* v. *Bank of Miss.,* 5 Eng. (Ark.) Rep. 516 ; *State* v. *Stade,* 1 D. Chipman's (Vt.) Rep. 303 ; *Taylor* v. *Bank of*

*Alexandria*, 5 Leigh's (Virg.) Rep. 471; *Allen* v. *Watson*, 2 Hill's (S. C.) Rep. 319.

But notwithstanding the difference of opinion existing among learned jurists as to the admissibility of a printed volume purporting to contain the statutes of a sister State as *prima facie* evidence of the written laws of such State, the authorities appear to be uniform that such statutes cannot be proved by parol. *Raynham* v. *Canton*, 3 Pick. 393; *Comperet* v. *Jernegan*, 5 Blackford, 375. And, indeed, most of the authorities before cited are applicable to this position.

Of course that part of the testimony of Mr. Low which was introduced to show the change in the organization of the courts could not be admitted; for the change was made by express statute, and formed a part of the written laws of the State. His testimony in this and other respects, so far as it went to show statute provisions, was inadmissible.

But we think we ought to hold that a printed volume of the statutes of a sister State, purporting upon its face to have been printed by its authority, and to contain the laws of the State, should be admitted as *prima facie* evidence to show what those laws are. Such a course seems called for by the great convenience and saving of expense that it will afford to parties, and by that confidential relation which exists between the States. The rule, too, would seem to be almost entirely free from any danger of abuse, and error or imposition could easily be detected.

But the exception taken to the amendment of the record of the judgment, cannot prevail; that is, if we assume that the powers and records of the district court were transferred to the supreme judicial court. The amendment was made to correspond with the minutes upon the docket. It was to cure a defect in the record which had been erroneously made by the clerk; and the order for the amendment was that it be made by stating the facts as they appeared upon the docket. The error was merely clerical, and one which the

court could order corrected without motion or notice to either party.

It appears, also, by the testimony of Mr. Low, that the facts fully warranted the amendment. He appeared by the direction and employment of the defendants, and answered to the action as attorney for them. Had there been no appearance, the judgment would not have been good beyond the limits of the State. If a judgment is rendered against a defendant residing out of the State where the suit is pending, it will be inoperative beyond the limits of the State where it is rendered, unless the court obtain jurisdiction of the defendant's person. But if a defendant voluntarily submits to the jurisdiction of the court by appearing and defending in person, or by attorney, he cannot, in this State, question the validity of the judgment which that court might have rendered against him. *Downer* v. *Shaw,* 2 Foster's Rep. 277, 281.

*Verdict set aside and new trial granted.*